UNITED STATES BANKRUPTCY COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| In Re | * | Case No. 04-10632 (ANV) |
| | * | |
| ARNOLD KILBERG, | * | |
| | * | |
| Debtor. | * | |
| DiORIO, | * | Adv. Pro. No. 05-01011 |
| | * | |
| Plaintiff, | * | Providence, Rhode Island |
| | * | April 24, 2007 |
| vs. | * | |
| | * | |
| 56 ASSOCIATES, L.P., et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

* * * * * * * * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE ARTHUR N. VOTOLATO
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | JOSEPH M. DiORIO, ESQ.<br>Law Office of Joseph M. DiOrio, Inc.<br>10 Dorrance Street, Suite 1200<br>Providence, RI 02903 |
| For the Defendant: | WILLIAM DELANEY, ESQ.<br>Tillinghast Licht, LLP<br>10 Weybosset Street<br>Providence, RI 02903 |
| Court Recorder: | MS. JENNIFER WATTS |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

Fiore Transcription Service, Inc.
67Elaine Drive
Shelton, Connecticut 06484 (203)929-9992

east side market?
A Very familiar, yes.
Q And your experience in east side market consists of what, sir?
A Leasing and sales.
Q Do you reside on the east side of Providence?
A I do.
Q And you physically have inspected this property; isn't that correct?
A I have.
Q And do you recall that, with court permission, I engaged you at the end of 2005 to assist me in my capacity as trustee to sell my 50 percent tenant-in-common interest?
A Yes.
Q That was 2005, correct?
A Correct.
Q And can you describe for the Court what efforts you made to assist me in connection with those sales efforts?
A We put together a marketing sheet with all the relevant information for the property, including demographics, traffic counts, aerial photographs, area retail, and sent that marketing sheet to our contact list of retail investors, investors and users inside and outside Rhode Island, as well as putting together a phone contact list to get in touch with some of the people we thought would be sincerely interested

in the property.

Q And those efforts began very soon after your engagement by me; is that correct?

A Correct.

Q And what interest did you receive in connection with your efforts to sell the 50 percent interest?

A Very little interest. There were some phone calls and a level of interest, but not much.

Q And what was the reaction when you were attempting to sell the 50 percent interest by the potential buyers?

A Generally, interested parties were excited about the location, but not excited about the idea of only buying half of a property.

Q And most recently, Mr. Green, did you undertake to advertise the sale of my interest?

A We did.

Q And when was that, sir?

A We advertised in the last three or four months in the *New England Real Estate Journal*, as well as *Providence Business News*.

Q If I can ask you to refer to my Exhibit D, which is marked and is admitted as a full exhibit by stipulation.

MR. DELANEY: I haven't seen it, but --

MR. DiORIO: It's part of the pretrial --

MR. DELANEY: Well, no, I understand that, but I

MR. DiORIO: Thanks, Judge.

Q Mr. Green, if I might ask you to take a look at the monitor, and we have marked, and we'll be admitted, Your Honor, by stipulation as a full exhibit, the Exhibit E. Are you familiar with that, sir?

A Yes, I am.

Q And is that -- what is it?

A That is a marketing sheet outlining the terms of the sale for 165 Angell Street.

Q And what did you do with this, sir?

A This is the marketing sheet that we sent around to various interested -- our list of investors, retail investors and users that might be interested in the property. You know, we had a mailing campaign and I believe we emailed out the marketing sheet as well.

Q Okay. I'm going to flip the page and show you -- if I can hold it still enough, so people can see it. The next -- I'll get there. Excuse me. The next picture, are you familiar with this, sir, where it says 165 Angell Street?

A I am.

Q And what is that?

A That's an advertisement that Marianne in our office placed in the *Providence Business News*.

Q When was that, sir?

A I can't see the date, but it was relatively -- I know it

was in the last three months.

MR. DiORIO: Your Honor, the exhibit recites March 5th, dash, 11, 2007.

Q Is that about the time you did it?

A Correct.

Q And finally, Mr. Green, here's another ad at the lower left, 165 Angell Street. What is that, sir?

A We own the inside cover of the Rhode Island section in the *New England Real Estate Journal*, so once a month, we place advertisements there. This was placed on the inside cover of the Rhode Island section in the *New England Real Estate Journal*.

Q And approximately when was that ad run?

A Again, it was sometime in the last three months, but I don't know exactly what the date is.

Q And did you, on my behalf, receive any offers as a result of the mailing with the marketing sheet and the ads that you recently ran?

A We received one offer.

Q When was that?

A That offer was received -- I think it was the end of last year from Brown University.

Q Well, prior to running these ads?

A Correct.

Q Okay. And is that the only offer that we -- that you

received on my behalf with respect to my interest, sir?

A It is.

Q And that was a Brown University offer, correct?

A Correct.

Q What was the amount of the original offer?

A The original offer, I believe was 500,000.

Q And what was the ultimate price that I agreed to with Brown?

A Six-fifty, 650,000.

Q And you recall, do you not, that I sought court approval to effectuate that sale?

A I do.

Q Okay. And whom did you negotiate that offer with at Brown University?

A Most directly, Abigale Rider.

MR. DiORIO: Your Honor, I'm going to refer to my Exhibit C, which I believe Mr. Delaney has seen, which is my cover letter to Brown, together with a copy of the real estate purchase agreement that was signed by me and Brown and authorized by the Court to take place.

Q You're familiar with this document, are you not, Mr. Green?

A I am.

Q And are you aware of the circumstances that gave rise to Brown's withdrawing from that proposal?

A I understand they backed out at the end -- before the end of due diligence.

Q And if I can now show you my Exhibit D, it's a November 30, 2006 letter. I've shared that letter with you, have I not?

A Yes.

Q And can you tell me what your understanding is with respect to Brown's interest in the property, based on that letter and discussions with Brown and with me?

A They passed on the property after reviewing the due diligence and said, basically, in my opinion, that they were interested in purchasing a 50 percent interest.

Q Did they express an interest in the entirety?

A They did.

Q Did they suggest a price range?

MR. DELANEY: I'm just going to object. The document speaks for itself.

MR. DiORIO: It certainly does, Your Honor.

THE COURT: You can tell me what it says. I'll put it on the record and we'll save a little time. It is a full exhibit, right?

MR. DiORIO: Yes, sir.

MR. DELANEY: All of the exhibits today will be full.

MR. DiORIO: That's correct, Judge. Your Honor, in

paragraph number 3 of this Exhibit D -- just give me a moment, Your Honor. Please.

(Pause.)

Q In paragraph number 3, it says, in this case, the second sentence: Subject to the negotiation, execution and delivery of a mutually satisfactory purchase and sale agreement, Brown would expect to pay the trustee, and by extension, the other 50 percent owner, somewhat more for each 50 percent interest than the price previously offered to the trustee, because it would be purchasing a whole property rather than a half interest.

But Brown would expect to pay less than the 50 percent of the appraised value of the property for each interest, due to the substantial expenses that must be incurred to make it code compliant.

A I'd refer you to the preceding first sentence also. The presumption is 56 and 57 would sell their interest.

THE COURT: Okay. All right.

MR. DiORIO: Contemplates a contemporaneous sale by me and 56 and 57 Associates. And they would pay, Your Honor, according to this letter, more than the 650 per a 50 percent interest, which is more than 1 million 3, but somewhat less than 1 million 950 -- the million 9 to 2 million 1 that Mr. Green had previously testified to as the -- his broker's opinion value.

THE COURT: Wonderful.

MR. DELANEY: Thank you.

MR. DiORIO: Thank you, Judge.

MR. DELANEY: Thank you.

Q Can I --

A Read back the question.

MR. DiORIO: Can we read back the question?

(Question played back.)

MR. DiORIO: Okay. I thought I had asked whether he had an opinion based on his experience, but I can rephrase the question. That's not a problem, Your Honor.

Q Mr. Green, based on your experience in this case, in connection with marketing my 50 percent tenant-in-common interest, and based on the feedback you received from potential buyers, and based on your experience as a broker, do you have an opinion to a reasonable degree of certainty regarding whether the estate's 50 percent share from a sale of a building as an entirety will result in more money to my estate than a sale of only my 50 percent interest? It's a yes or no.

A Yes, I believe it will.

Q And your opinion is?

A It's more valuable to sell in its entirety.

Q And is it significantly more valuable to sell in its entirety?

A I would say so, yes.

Q Mr. Green, are you familiar with the offer I recently received from Brown University for 1.3 million dollars?

A I am.

MR. DiORIO: Your Honor, I'll refer to my Exhibit A. It's the April 12, 2007, a letter to me from Ms. Heida Cobra of Brown University.

Q Mr. Green, that's a sale of the entirety that's the subject of that letter; isn't that correct?

A Yes.

Q Can you describe, based on your discussions with Brown and your familiar -- based on your discussions with Brown, can you characterize Brown's level of interest in this property?

A I think it's been consistent and strong.

MR. DiORIO: One second, Your Honor.

(Pause.)

MR. DiORIO: I have no further questions at this time.

THE COURT: Mr. Delaney.

MR. DELANEY: Yes. Thank you, Your Honor.

CROSS EXAMINATION

BY MR. DELANEY:

Q Good afternoon, Mr. Green. How are you?

A I'm well. Thanks. How are you?

process.

Subsequently, within 180 days of the time that the accommodation title holder takes title to the new one, the taxpayer would sell one of those potential relinquished properties, and you would do a paper form of the exchange at that point. And so the point is, you can sell them then buy or you can buy them then sell. And basically all, you know, with mirror image rules on the 180 days and the identification process.

Q Is it possible, Mr. Hazel, to sell tenant-in-common interest, partial interest in an entire property as -- to make those part of a 1031 exchange?

A Yes. The outline contains a citation to a revenue ruling, but it's firmly established that it's not just total fee interest in a property. You can sell a co-tenant interest. I believe there are rulings on remainder positions. So any interest -- any fee -- anything recognized under the state law is a fee interest. Again, it's going to be in commercial or business property. Not your home. Your homes don't qualify, but partial percentage interest do qualify and we handled any number of exchanges at my company, Atlantic Exchange, where, you know, you might have two or three co-tenants that were selling. And some or all, you know, one might -- if you had three where they owned a third each, two might do an exchange and one might just take the

cash and pay the tax. And so we certainly handled exchanges with tenant-in-common interests.

Q So in this case, if I have two 25 percent tenants-in-common, each of them could take advantage, if they so choose, of a 1031 exchange?

A Yes.

THE COURT: On this 180 day restriction for either buying or selling you say?

THE WITNESS: Yes.

THE COURT: Does that put the original seller at a disadvantage when they start to run up against the deadline? In other words, are there automatic bargains coming up when that deadline approaches?

THE WITNESS: Well, and it's a good question, Your Honor. And, of course, the first deadline is the 45 days.

THE COURT: Yes.

THE WITNESS: Really is where, in my experience, you know, many times when, you know, people who are starting an exchange, they have an idea of the general type of property they would like to buy, particularly if they're experienced owners of real estate, which, you know, many of our clients were. So, yes, it's definitely -- you have to identify within 45 days and then you need to close. And, you know, it's certainly not as easy, for example, if the IRS code simply said, you know, there were other provisions where

you sell like an eminent domain where there's a, you know, a taking of a property. And the rule there is, is better in some ways in that you have two years to just go buy what you'd like to go buy. That's not the provision with section 1031. You know, you have to identify in 45 days and you have to buy within 180.

THE COURT: And if you don't you lose?

THE WITNESS: Yes. The downside is you pay the tax you otherwise would have paid. You know, and at this point in time, capital gains rates are at historic lows, and so, actually, I would have some people at the Atlantic handling these exchanges where they might start the process and decide, after chatting with their accountant, that, you know, they just as soon pay the tax.

Q Mr. Hazel, may I inquire of when one is a seller and has to purchase properties, what's the practice? Does that seller walk around with a big saying, "I need to do a 1031 exchange in a hurry, so I want to pay too much"? Or is the practice that they don't disclose that?

A Typically, the most sophisticated owners of real estate are not going to disclose, you know, to their prospective, you know, who they're trying to buy form, I guess, the prospective sellers. Typically, you wouldn't disclose you're doing a 1031, at a minimum, until you're, you know, sort of signing the purchase and sale agreement. And there's no --

actually, there is an industry practice, and we do advise, as a general matter, we tell clients whether you're selling or buying as part of an exchange, you ought to put into the purchase and sale agreement a simple statement that indicates that the third party, be they seller or buyer, will cooperate with your exchange.

We would always tell our clients when they're on the buy side, don't raise that until you've got the deal negotiated, and then put that in. Some clients wouldn't even put it in then, because it's not required. It's just kind of a best practice. The only thing that's required as to the third parties is at the time of the buy, on the buy side, you give them that one paragraph statement that's in the materials, a sample, that simply notifies them that you're doing an exchange, and typically they sign it, but they don't have to.

Q And in terms of the properties that are eligible for this, is there a national market for these types of properties?

A Well, you know, the -- it's certainly 1031 transactions are certainly a very robust part of the economy. I've seen various estimates and sometimes I don't know which estimates to believe, if any, but clearly billions and billions of dollars are bought and sold on a 1031 basis every year in the country. As I say in the outline, you know, particularly

since the 1991 regulations came in, it's crystal clear how to do an exchange, so if you're -- so if you're an owner/developer person who invests in real estate, there's no reason to pay tax unless you want to pay the tax. If you're happy to stay invested, you can always complete a 1031 exchange.

I've seen estimates that on the west coast, 90 percent -- 80 or 90 percent of all commercial transactions are done as part of an exchange, either as a buy or a sale to complete -- I mean a sale to start an exchange or a buy to complete an exchange. There are historic reasons why 1031s are more widespread on the west coast than the east coast, but certainly on the east coast now, there's very wide knowledge, acceptance, and understanding of 1031 exchanges.

When we started in 1998, you know, my partner and I, and eventually a marketing fellow, we'd go out and speak to accounting groups and commercial brokers and residential brokers and we would, you know, in '98 and '99, a lot of people were -- had never heard of it. But by 2003 and 2004, you know, the market was much more sophisticated and educated and I haven't seen -- I've seen that 90 percent figure for transactions on the west coast. I haven't seen comparable, but I'm sure that there's not a commercial broker that doesn't know what a 1031 is. There's not a professional owner of real estate that doesn't know. And there's -- you

might be ordering a sale that might not otherwise occur, you know, you would manage what you're doing as a person that owns multiple properties. You know, if you're going to sell a relinquished property and you'd like to do an exchange, you say to your buyer, "Hey, I know you want the property. I'm ready to sell, but you know what, could you give me nine months on the closing date?" because now that gives them nine months to look. Not necessarily the fact pattern here.

Q And in my case, where I hold a 50 percent tenant-in-common interest and 56 Associates and 57 Associates own a 25 percent tenant-in-common interest respectively, is it your opinion, to a reasonable degree of certainty, that if 56 and 57 participate in the sale, they could utilize a 1031 exchange?

A Yes. There's no -- there's no doubt in my mind that if they simply do what the ordinary thing that an ordinary seller would do, and, you know, pursuant to His Honor's order, if a sale were to occur, you know, you would sell your interest and pay the tax, or do whatever the accountants tell you to do, and the two co-owners would simply join in the purchase and sale agreement and they would hire an intermediary and they would sign exchange documents and they'd do the assignments that are outlined here.

Again, this is well established. There's no reason not to be able to do a 1031. As I said earlier, co-tenants

will often, you know, if you have three 1/3 owners, two that might do an exchange, one might take the cash and pay the tax. So, yes, there's no doubt in my mind but that these two entities could do an exchange if they just did the ordinary and customary thing.

Q Now, let me ask you this. If the Court allows me, as trustee, to actually sell the entirety, I would be delivering a deed to the entirety pursuant to a court order. What is your view with respect to that and the ability to take advantage of the 1031 exchange?

A Well, I mean, I would say a couple of things. First, I would hope that, you know, the order would give flexibility to allow you to simply sign a deed for 50 percent and allow the two partnerships to sign their own deeds.

Q So they would cooperate in the sale; is that correct?

A Correct.

Q That's your assumption?

A So that would be, to me, the normal and customary thing to do. And as a tax attorney, you know, whenever there's a clear path to successfully achieve a desired tax result, there's no reason to go out of your way to create problems, you know, yourself to try and structure it in the fancy way, or not do the normal thing that you would do to structure it properly to get the tax result you want.

Now, if for whatever reason, you, as the bankruptcy

trustee, were to give a deed to the entirety, because perhaps there was non-cooperation, or for whatever that reason might be, you know, I was -- I've certainly never seen that situation, again, because people do the ordinary and customary thing when they're trying to get a tax result, but, you know, I'm assuming that, notwithstanding the fact that you -- that you as trustee would be signing the entire deed, you're not going to get all the proceeds. There's no doubt but, you know, the two co-tenants are entitled to their share.

Q That's correct.

A And I assume that -- I assume that the IRS would give the view that they were the true taxpayer and the true seller of that property, even if it was in your name. I mean, so -- and absent an exchange, I assume there would be no doubt in anybody's mind that they would pay the tax, because they're the true seller.

Well, if that's true, if in point of fact, you know, you were to deliver a deed, because that's just the way it went, but you were selling for yourself and acting sort of as the selling agent for the other two, you know, I would say that, you know, a deed of that sort would be fine, so long as, you know, the two co-tenants signed an exchange agreement and did whatever else their intermediary or their tax lawyer -- because it getting a little tricky, they might want to

call a tax lawyer -- you know, to do other than you signing the deed on behalf of everybody, they would do everything else that they would ordinarily would do. And I don't see how the IRS would treat anybody but them as the seller of that property.

Q Is it fair to say that the cleanest way would be for the 56 and 57 Associates to actually participate and deliver deeds, if they chose to do a 1031?

A Sure. Yes.

MR. DiORIO: I don't have any further questions at this time.

(Pause.)

CROSS EXAMINATION

BY MR. DELANEY:

Q What authority do you have that 56 Associates and 57 Associates can go forward into separate 1031 exchanges relative to the relief that Mr. DiOrio was attempting to seek here under section 363(h) of the bankruptcy code?

A You know, I'm not really sure I understand the question. Just -- if you're asking are there any rulings related to bankruptcy transactions involving an order where co-tenants were all ordered to sell, I don't know of any such rulings.

Q How about any case law?

A No.

Q Okay. And you've never been involved in one of these

A Hundreds.
Q And how about a mixed use properties in Providence?
A Again, several, many.
Q Many. And how about on the east side of Providence?
A Many. My office is located on the east side of Providence.
Q Did you have an opportunity to inspect the real estate that's known as 165 Angell Street in Providence?
A Yes, I did.
Q And could you -- I'm sure the Court has seen enough pictures and was able to witness the -- my contribution to the improvements of the property, my 50 percent contribution to those improvements. But could you please describe the lot and the building, so -- briefly, so that we all are on the same page.
A Sure.
THE COURT: As of what time now?
Q When did you inspect the property, sir?
A I inspected it -- most recent inspection I did was March 30th, 2007.
Q As of March 30.
A Certainly. Subject is located just to the west of Thayer Street on Angell Street, on the south side of Angell Street, about two doors west of the corner. It's a 4756 square foot predominantly rectangular shape lot, interior

79

lot. Improved by an 8,104 gross square foot mixed use building, and that 8104 square feet includes the basement, which is predominantly finished out. It's a wood frame structure. Basically three stories above the foundation with a mansard roof, wood shingle, slate and I assume a membrane roof covering on the top. It's currently divided into two retail units. The basement, which is about a six or seven step down from Angell Street, is occupied by Liquid Lounge, which is a bar catering, I assume, primarily to Brown students.

The ground level, which is actually about four or five steps up from Angell Street, is occupied by an Asian restaurant, called Phonatic's, I believe. Nice shape.

Up above on the second level and on the third level, there are four efficiency apartments on each of those levels. They are very small. They are approximately 330 to probably 350 square feet, one room, small bath, little kitchenette.

The building has sprinklers. There are three heating systems. It's in all round reasonably good condition. And it's in a very good location.

Q And you heard -- you were here when Mr. Green testified about the location. How would you describe its location?

A Well, the Thayer Street corridor is probably the most valuable stretch of real estate on a per square foot basis in

and the offers from Brown University to you.

Q How about the leases? Did you take a look at those?

A And we looked at the leases.

Q Did you look at any -- did you look at the lease with Phonatic's as well as the Liquid Lounge?

A Yes, we did.

Q And do you have an opinion, to a reasonable degree of certainty, of the fair market value of this property?

A I believe the fair market value of this property is 1 million 850,000 dollars.

Q And that valuation is for a 100 percent fee simple interest; isn't that correct?

A Yes, sir.

Q Did --

THE COURT: Before you leave --

MR. DiORIO: Go ahead.

THE COURT: -- that subject. If you were, I don't doubt that you are. But I know it's not a normal consideration or adjustment in the appraisal process, or at least I think it isn't, Mr. DiOrio, I guess, or everybody, I'll repeat again, knows you don't have to object to the questions I ask, because I get the feeling that many of them are objectionable anyway to somebody.

Did you give any consideration to this pending litigation and nature of it, the history of it, what the

buyer was making an offer, such as Brown did in this case, and was aware of litigation circumstances, would that affect a buyer's willingness possibly to pay more or less?
A Sure. Of course it would.
Q Now, just to complete your testimony with respect to my 50 percent interest, in your opinion, is the value of my 50 percent tenant-in-common interest significantly less than what I would receive if I sold it as a 50 percent interest, versus if the property were sold as an entirety and I got half the proceeds?
A Absolutely.
Q And, again, just to be brief. The reasons for that are -- if you could summarize.
A The reasons for that are that you have -- when you buy a 50 percent interest, you do not buy control. You have -- you have to have an agreement with someone else in order to mortgage the property, sell the property, lease the property, manage the property, no matter what. So you have no control.
Q Is unknown partners also an issue?
A Certainly.
Q Okay. Now, Mr. Scotti, what zone is this property in?
A The property is in a C-2 zone, commercial 2 zone.
Q And what are permitted purposes there? I know you looked at zoning. You say so in your report.
A Any number of commercial use is predominantly retail and

office. And there may be residential use allowed there as well. I'm not positive on that. This property, I believe, given the lot size and the age of the property and its current occupancy, it's a pre-existing legal, non-conforming use.

Q And the lot size is approximately 4,700 square feet?

A 4756, I think.

Q And based on the physical characteristics of the lot and the building, can the land be subdivided physically?

A I don't see how you could subdivide the land. Yes.

Q Okay. Can the building be physically separated?

A You mean, could you put a wall down the middle? No. No.

Q So insofar as that is concerned, in your view, is it practicable to partition the property?

A No, I don't believe so.

Q Now, talk to me a little bit about condominiums. Are you familiar with a condominium development?

A Yes, I am.

Q And is your familiarity based on your personal experience?

A On personal experience and on my work-related experience.

Q So you have condominium developments that you're an investor in; is that correct?

So I think you've got a fair market.

Q Is it a different market from a market for the sale of the building as an entirety?

A I believe it's a significantly different market.

Q And what is the market for the sale of the building as an entirety?

A I believe you have a very, very strong market for the building in its entirety. You have -- I can name six potential buyers who own significant properties on Thayer Street off the top of my head that, I'm sure, would be interested in this property. Of course, you've got Brown University.

Q And if a condominium were created, what would change, if anything, in connection with the ownership?

A Well, nothing. You'd still own -- you'd still have three owners; two with 25 percent and one with 50 percent.

MR. DiORIO: One second, Your Honor.

(Pause.)

Q Do you see this property as an entirety as a property that would be -- the value would be enhanced by exposure to the market as an entirety?

A Absolutely.

Q And as a broker and as an appraiser, you've had experience with the so-called section 363 sales, have you not?

UNITED STATES BANKRUPTCY COURT
DISTRICT OF RHODE ISLAND

In Re * Case No. 04-10632(ANV)
*
*
ARNOLD KILBERG, *
*
Debtor. *

DiORIO, * Adv. Pro. No. 05-01011
*
Plaintiff, * Providence, Rhode Island
* April 25, 2007
vs. *
*
56 ASSOCIATES, L.P., et al., *
*
Defendants. *
*
* * * * * * * * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE ARTHUR N. VOTOLATO
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Plaintiff: JOSEPH M. DiORIO, ESQ.
Law Office of Joseph M.
DiOrio, Inc.
10 Dorrance Street, Suite 1200
Providence, RI 02903

For the Defendants: WILLIAM J. DELANEY, ESQ.
Tillinghast Licht LLP
10 Weybosset Street
Providence, RI 02903

Court Recorder: JENNIFER WATTS

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

Fiore Transcription Service
67Elaine Drive
Shelton, Connecticut 06484 (203)929-9992

hard to sit here with all these assumptions --

BY MR. DIORIO:

Q I'm asking to assume the assumptions. That's --

A But --

Q That's what your opinion is based on.

A -- based on that --

MR. DELANEY: He just responded the best he could.

THE COURT: Put a question. Maybe it's the same one you just --

MR. DIORIO: Certainly, Judge. Sure.

THE COURT: I'm not sure it was a complete sentence or something, I don't know, but --

BY MR. DIORIO:

Q Based on the assumptions I asked you to make, and those are that everything that needs to be done with respect to a 1031 exchange, except I as under court order deliver the deed -- assuming all of those facts, do you have an opinion to a reasonable degree of -- what is your opinion with respect to whether or not that would comply with 1031?

MR. DELANEY: Is his question that -- does his question presume that 56 and 57 Associates signed the agreement? Is it that they went through all of these formalities?

MR. DIORIO: Yes.

MR. DELANEY: Because the particulars that he's

been --

THE COURT: The question says assuming all the formalities have been met.

MR. DELANEY: Right. And again --

THE COURT: Your objection is overruled, okay?

MR. DIORIO: What --

MR. DELANEY: May I be heard for just a second though?

THE COURT: Go ahead.

MR. DELANEY: He's been engaged based upon the proposition that there will be no cooperation, which is what he based some -- most of his research or at least a percentage of his research on, Your Honor.

THE COURT: What's your answer to that, that Mr. Paolino -- or, 57 56 refuse to sign whatever papers they need to sign to carry out the court order?

MR. DIORIO: That got us -- well, that's a self-inflicted wound, Your Honor. That's how I see it. I mean my answer is --

THE COURT: Well, what's the cure for it?

MR. DIORIO: The cure for it is there's no cure. If they don't want to take advantage of 1031, they pay the tax. There's no cure for it. I can't sign the papers for them.

MR. DELANEY: There's an equitable argument under

363, which we will make to Your Honor later, that you can deny the relief from claim and let him go forward and sell his 50 percent interest.

THE COURT: For admissibility purposes, the objection's overruled.

MR. DELANEY: Thank you.

BY MR. DIORIO:

Q What's your opinion?

A If everything is totally fine and meets every requirement and is unchallengeable and the only difference is that trustee signs the deed, then I think you have a strong likelihood that you could effectuate a 1031 exchange.

Q Now let me ask you this: Have you --

THE COURT: Were you finished?

MR. DIORIO: Oh, I'm sorry.

THE WITNESS: Yes.

THE COURT: Okay.

MR. DIORIO: I apologize.

BY MR. DIORIO:

Q Let me ask you this: Have you encountered situations where a power of attorney has signed deeds for a seller in 1031 context?

A I personally have not, but I wouldn't -- I personally haven't, but I don't know -- with the exchanges that have been handled in All States, the 1031 -- my company, you know,

UNITED STATES BANKRUPTCY COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| In Re<br><br>ARNOLD KILBERG,<br><br>Debtor. | Case No. 04-10632(ANV) |
| DiORIO,<br><br>Plaintiff,<br><br>vs.<br><br>56 ASSOCIATES, L.P., et al.,<br><br>Defendants. | Adv. Pro. No. 05-01011<br><br>Providence, Rhode Island<br>April 27, 2007 |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE ARTHUR N. VOTOLATO
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Plaintiff: JOSEPH M. DiORIO, ESQ.
GARDNER H. PALMER, JR., ESQ.
Law Office of Joseph M. DiOrio, Inc.
10 Dorrance Street, Suite 1200
Providence, RI 02903

For the Defendants: WILLIAM J. DELANEY, ESQ.
ROBERT N. HUSEBY, SR., ESQ.
Tillinghast Licht LLP
10 Weybosset Street
Providence, RI 02903

Court Recorder: JENNIFER WATTS

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

Fiore Transcription Service
67Elaine Drive
Shelton, Connecticut 06484 (203)929-9992

you used in your report, based upon the work that you performed in preparing this report, the research that you did, the analysis that you performed, and the generating of this report, do you have an opinion as to the value of the subject property as to a sales comparison approach?

A Yes. My opinion of value is presented on page 5 of the appraisal, $2,275,000.

Q Okay. And you arrived at that by?

A I arrived at that by comparing the subject to three other sales that I presented in the appraisal and adjusting the sales for differences relative to the subject property.

Q Okay. Let's turn your attention now to the income capitalization approach. Could you briefly describe to the Court what that approach is?

A Income capitalization approach represents when you have a rental property or an income-producing property, probably the best, most reliable way to value property. It looks at the net operating income, which is rental revenue minus expenses, and you arrive at a net operating income for debt service, for amortization, before income taxes. And that net operating income is capitalized or discounted at a market oriented rate of return, the rate of return that a buyer would be willing to accept to acquire this property. And the combination of the NOI, net operating income, and the rate of return in the capitalization or discounted process result in

Q Okay. But you do recognize that a tenant-in-common ownership can negatively affect the value of a property if one of the tenants in common wants to sell his interest, correct?
A No, I don't recognize that.
Q You do not. So you do not believe that, for example, the absence of one tenant's ability to control the property negatively affects the value of that tenant's interest?
A I testified earlier that I didn't feel I was prepared to testify to a tenant's interest -- value like tenant's interest and I -- I'm going to repeat that.
Q My recollection of your testimony was you were asked by Mr. Delaney whether you had an opinion as to the value of Mr. DiOrio's specific interest in this property and you were not prepared to address that point, correct?
A I was not and -- but I'm not prepared to -- I do not believe I'm prepared to answer the question you asked me two questions ago.
Q Do you remember again in your deposition this past Sunday being asked the question, and it appears on page 12, "Now you indicated earlier in your testimony that there may be an impaction value if you're appraising a fractional interest, correct?" And what did you answer?
A "Yes, there may be."
Q And then I asked you "Okay, and can you explain that

further, please?" And what did you answer?

A I said, "If a buyer is purchasing a fractional interest and it is subject to -- for instance, the worst case might be if it's subject to a general partnership agreement and that partnership -- the partnership agreement invests the power or -- or with a general -- invests the power with a general partner who determines who gets dividends, where the cash flow goes, how the money is spent, and the acquirer is buying limited partnership interest in that entity, he has lack of control."

Q And then turn it over to the next page your answer continues.

A "There would be a discount in that case for lack of control."

Q So in fact you do recognize the concept that selling a fractional interest in property can have a negative impact on the fractional interest, correct?

A There may be no lack of control when you sell a partial interest.

Q Okay. But that's not what I'm asking. You do recognize the concept that there can be an adverse affect on the fractional interest value when you're attempting to sell just that fractional interest, correct?

A Depending on the circumstances, there could be.

Q Thank you.

A I have, but I can't pinpoint it and I can't remember it all.

Q Okay.

A If I was younger, probably I could remember it all, but I'm 39.

THE COURT: And holding, right?

THE WITNESS: And growing, yes.

BY MR. DELANEY:

Q Let's go into the particulars about you -- your acquisition of a portion of 165 Angell some 22 years ago. Could you give us a brief background of what went on that made you decide to make that investment decision?

A Yes, that property was for sale. It was owned by the Chestnut Hill Realty Company. In fact, Attorney Edward Batozzi (phonetic) and there was Angell -- was the lawyer for the Chestnut Hill Realty Company and I bought the property from them.

I got the -- even the receipt I gave. In fact, I gave $100 deposit on it I think it was at that time until agreements were done. And I was with Arnold Kilberg who was a friend of mine and at that time was my accountant. And I said, "I just bought this piece of property on Angell Street, would you like to participate in it with me?" He says, "I'd love to."

I says, "Look, Arnold, I'm buying it to keep, I'm

not buying it to sell. This could only enhance in value. I think we got a good value here at $515,000. I'll get financing at 350 on it from Fleet." And I says, "You put in 80,000 and I'll get 56 was my son's company. We just went through a 1031 and I went through a 1031 at 57 and we'll put 40,000, 40,000, and 80,000's a $160,000 plus the expenses that's make the deal." He says, "I'm with you." I says, "I want to run it and I don't want to have any problems with you."

We ran it. I never had a problem with Arnold in 22 years and may his soul rest in peace. He passed away and I'm sorry he passed away. He was a brilliant man.

Q So the decision to purchase this property or purchase this interest in the property was for the long term?

A I have many properties I've owned for 20 and 30 years. I've -- I got some properties that I've owned since 1968.

Q But this property in particular --

A I bought it in '85; in April of '85.

Q For the long --

A And I bought it to keep, not to sell.

Q What did you see in 1985 relative to that property that caused you to make the business decision to purchase it?

A Because I just drove up the street and I saw Brown University growing and blossoming, and I says this can only get -- enhance in value, which my decision was 100 percent

right.

Q Subsequent to 1985 up to and include the time in which Mr. Kilberg filed his bankruptcy petition, were there any disputes or any court actions relative to partitioning this property between yourself, your interest, your son's interest, and Mr. Kilberg?

A I never had a problem with any piece of property with any co-tenant that I ever had in 59 years that I been in business.

Q So the answer is that you never --

A And my properties go from small to very large.

Q So no partition proceedings, no business disputes that arose and some sort of litigation?

A Nothing. Absolutely positively nothing.

Q Okay. Okay.

A A partnership is like a marriage. You get married, you expect to stay together. Let me tell you something. Sometimes you can't make it. But when I make a marriage in real estate, I make sure it stays together. And I -- and my philosophy has been true. I've owned the Cranston Brewery for eight years with Neil Ellis. We're the greatest -- we became the greatest of friends. I own a piece of property -- a tremendous piece of property in Newport, Rhode Island, right on the waterfront. I'm building condominiums down there. I got a partner's with me since 1985. We have no

problems. We don't -- you don't go into these deals to make problems. Anyone that says you can't get along, then you shouldn't get married neither because you're not -- how do you know you're going to get along?

Q Have you received any offers over the years to purchase your interest in 165 Angell?

A I've had people that would call, but like I said, it's not for sale. Because Arnold never intended to sell it. It wasn't bought for resale. We bought it to keep as an investment, just like it's all paid for now. My God, we get -- should get $60,000 a -- 50 percent and 50 percent a year, if the property is maintained. We had a lot of problems maintaining the property and renting the property because I had a partner after Arnold left that didn't want to do nothing with it. He thought the birds could go inside there and rent it.

Q Who was that?

A Mr. DiOrio. He held my hands. He held my hands that he wouldn't allow me -- there was a tenant I had that was paying $4,000 a month and I said on this court here that that property at that time was worth about 850, 875,000 dollars.

You had a tenant that was Liquid Lounge didn't know what to do because they -- they knew there was problems with me with the receiver.

The tenant upstairs, Mrs. Kim, was a wonderful

percent rented than get 110 percent of the rents or 100 percent of the rents and be 80 percent rented. I don't have vacancies. I got -- my tenants think the world of me. Because I think the world of them. They pay the bills.

Q What is your expectation of the property value over the next few years?

A Well, at my deposition --

MR. DIORIO: Objection.

THE WITNESS: -- when Mr. Palmer was taking --

MR. DIORIO: Objection.

THE COURT: Hold please, hold please.

I'm going to rule on this objection. We're going to take a short recess first.

MR. DELANEY: Sure.

THE COURT: Can I see counsel?

You can step down for a couple minutes, sir.

THE WITNESS: Thank you.

(Recess from 4:04 p.m. to 4:19 p.m.)

THE COURT: Go ahead.

MR. DELANEY: Yes, thank you. Your Honor, I think we had an objection that was pending.

THE COURT: Right. Sustained.

MR. DELANEY: Thank you.

BY MR. DELANEY:

Q The purpose of this pleading -- excuse me, the purpose

of this case that we're here today is the request by the trustee to sell the entire interest of 165 Angell, including 56 and 57 Associates with the permission of the Bankruptcy Court and you, on behalf of 56 and 57 Associates, are objecting to that. Could you please explain why you are objecting to that?

A Yes. This is set up in my estate planning. This is all paid for. It's got good income. It's in good condition. Upon -- if I was to sell it now, I'm -- I hurt my taxes by a great amount of dollars. But upon my death, the value of this property raises and then my estate gets this at a stepped up basis. If they appraise it for two and a half million dollars, my estate will get it at the -- the total being appraised at two and a half million dollars. If they get it today, they get it at a stepped up basis of zero if I sell it now, and that's why I'm going to get hurt tremendous -- I'm hurting my estate, I'm -- and this is my income for retirement. It's all paid for. I bought this not to sell. If I wanted to sell it, I would have sold it 21 years ago.

Q You have an alternative, do you not, and the trustee has expressed this through testimony, of a 1031 exchange? Why is that you feel a 1031 exchange does not benefit you?

A At my age at 78 years old, why would I want to take six, seven, eight hundred thousand dollars, go out and buy something at 1031, and end up owing $2 million on a 20 year

mortgage? Does that make sense? They ought to have me locked up in Butler. They won't even take me in Butler. They'll put me the INH.

Q Regarding the current status of 165 Angell, you've heard -- you heard testimony from the appraisers and that. What's the best use of this -- one 165 Angell?

A The best use of 165 Angell Street is what it is now. It's proven itself what it is now. Everything's been there for the last 10, 12 to 15 years.

Q Okay.

A It can enhance in value when it joins Brown's campus at a later date. But let me put it this way to you. They could lease the land if they wanted to and knock the buildings down and have a 100-year lease on it. Then I still got no tax problem.

Q Would you consider the option of condominiumizing your interest in --

A No.

Q -- 165 Angell?

A No, it's -- that's waste of time and money and effort. But they're very low when they $82 -- $82,500 for an apartment there. They better go read the book again.

Q But it could be condominiumized?

A It could be, absolutely. You could condominiumize this right here if you wanted to. You can condominiumize

THE COURT: -- or I'll step out.

MR. DELANEY: No.

THE COURT: Okay.

(Pause/counsel confer.)

MR. DELANEY: Okay. We have a stipulation, Your Honor.

THE COURT: Okay.

MR. DELANEY: We stipulate that the income that he received relative to his interest in 165 Angell Street is not necessary to live on.

MR. DIORIO: That's fine, Your Honor.

BY MR. DIORIO:

Q Now, Mr. Paolino, isn't it true that as part of a real estate developer investor, it's an ordinary part of the business to pay capital gains taxes?

A If you sell.

Q Yes, upon a sale.

A If you're using a piece of property for the sole purpose of investment and you sell it and you've had it over a year, you can take -- the way I understand the IRS tax laws, you can take capital gain.

Q And isn't it true, Mr. Paolino, that you really don't object to paying income taxes when you make a profit on a sale of real estate; isn't that true?

A That's what America's all about. I love to pay taxes.

When I pay taxes, that means I'm making money.

Q So in fact, paying taxes, if this property were sold, would mean that you made money; isn't that correct?

A If I sold a package of gum that cost me nothing, sold it for nickel, I made money. That's not what I'm in business for, Mr. DiOrio.

Q Please answer the question.

A What's that, if I sold this property, I pay tax on it?

Q Yes.

A Course we got to pay -- I'm making a profit.

Q And --

A (Indiscernible) nothing on the books.

Q And that's a good thing, isn't it, Mr. Paolino?

A What's that?

Q Making a profit selling this property.

A Well, everyone --

MR. DELANEY: Objection.

THE WITNESS: -- loves to make a profit, sir.

MR. DELANEY: Objection. I think he's testified that he doesn't want to sell the property, he wants to hold it long term, and that line -- that question really is not proper based upon the response that's already been elicited.

THE COURT: No, I don't buy that for an argument. Overruled.

MR. DIORIO: Could you repeat the question, please?

(Audio played back.)

BY MR. DIORIO:

Q Could you answer the question, that's a good thing --

A I don't understand your question. You say -- I don't understand your question.

Q When you make money on the sale of a property, it's a good thing that you have to pay taxes because it means you've made money; isn't that correct?

A That's true.

Q And you purchased this property in 1985 as part of a 1031 exchange; isn't that correct?

A That's right. Yes.

Q And you're very familiar with the workings of a 1031 exchange --

A Yes, I am.

Q And how many approximately have you done during the course of your career, sir?

A Quite a few.

Q Ten?

A Oh, I -- I been in -- if you can remember 58 years of your business, you're a genius. I did a lot of them, 1031's. That's all I -- that's only way you can say it. I can't enumerate them. And some they don't fit in that you can't do.

MR. DIORIO: One moment, Your Honor?

UNITED STATES BANKRUPTCY COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| In Re | * | Case No. 04-10632(ANV) |
| | * | |
| | * | |
| ARNOLD KILBERG, | * | |
| | * | |
| Debtor. | * | |
| DiORIO, | * | Adv. Pro. No. 05-01011 |
| | * | |
| Plaintiff, | * | Providence, Rhode Island |
| | * | May 3, 2007 |
| vs. | * | |
| | * | |
| 56 ASSOCIATES, L.P., et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

* * * * * * * * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE ARTHUR N. VOTOLATO
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | JOSEPH M. DiORIO, ESQ.<br>Law Office of Joseph M. DiOrio, Inc.<br>10 Dorrance Street, Suite 1200<br>Providence, RI 02903 |
| For the Defendants: | WILLIAM J. DELANEY, ESQ.<br>Tillinghast Licht LLP<br>10 Weybosset Street<br>Providence, RI 02903 |
| Court Recorder: | JENNIFER WATTS |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

Fiore Transcription Service
67Elaine Drive
Shelton, Connecticut 06484 (203)929-9992

by-one.

Your Honor, in our joint pretrial order, we stipulate that partition in kind of the property into separate and distinct lots is impracticable. You heard testimony from Mr. Greene, Mr. Scotti that you can't cut the lot in half. It's a small city lot. You can't cut the building in half.

The only question that may linger is whether or not a condominiumization of the property is something that is practicable and is permissible and is legally permissible as part of the partition in kind analysis, and as Mr. Scotti testified and as Your Honor's aware of condominium law, if we condominiumize the property, two major things. One is I'm still a co-owner with two other co-owners of every unit. I'm still a voter with respect to the management.

Second is -- and it's clear Mr. Scotti testified to this -- that it's not the highest and best use of the property and it will not realize the highest and best value. There are different markets reached with respect to the sale of the residential units, with respect to the sale of the bar, with respect to the sale of the restaurant. We're not reaching the big players on the east side to buy a property that they can control.

A condominium is a voluntary act. It's not a separation. It's where two parties decide we agree we want

to create a condominium. It's not a form of partition.

Again, you end up with three co-tenants of each unit. The residential units, Your Honor, Mr. Scotti testified and Rhode Island law provides that the residential unit occupants have rights to buy the units if you do make a condominium out of it. And if you sell a unit, you have a partition by sale, it's not a partition in kind.

So where you have a partition by sale, Your Honor, we say sell the entirety, maximize the value, that's practicable. Going through a process with the Paolinos and me as condominium partners is not practicable. Again, the history of the case underscores that.

The end result would be that the relationship of the parties would be just further complicated, more complicated, and that speaks volumes to the question of whether it's practicable or not and demonstrates strongly that it's not practicable.

Your Honor, as to the second question, will the estate receive significantly less if I sell my undivided 50 percent interest than if I sell -- if the property's sold as an entirety, we think the answer to that is obvious. We think the answer to that is yes, we will receive less. Mr. Scotti testified it would be 25 to 40 percent less. Mr. Greene testified it would be significantly less.

Your Honor, there are cases which we cited in our